AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of the Vehicles Registered to Marlene Leon and Amairani Sanchez, as further described in Attachments A-1, A-2, and A-3. | )<br>)<br>)<br>)    Case No.  2:23-mj-2031 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachments A-1, A-2, and A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846, 841(a)(1) | Distribution of Controlled Substances and Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 843(b) | Use of a Communication Facility to Facilitate a Narcotics Trafficking Offense |
| 18 U.S.C. §§ 1956, 1957 | Money Laundering; Engaging in Financial Transactions with Property Derived from Unlawful Activity |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Anthony G. Mitchell, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Alicia G. Rosenberg
*Printed name and title*

AUSA: Thomas Magaña (213-894-1334)

## <u>ATTACHMENT A-1</u>

<u>PROPERTY TO BE SEARCHED</u>

SUBJECT VEHICLE 1: The white Jeep registered to Marlene LEON at 9457 Plum Court, Hesperia, California, 92345, bearing California license plate 8AAH784, and any digital devices found there

**<u>ATTACHMENT A-2</u>**

<u>PROPERTY TO BE SEARCHED</u>

SUBJECT VEHICLE 2: The dark gray Chevrolet Tahoe registered to Marlene LEON at 9457 Plum Court, Hesperia, California, 92345, bearing California license plate 8AJT371, and any digital devices found therein.

**ATTACHMENT A-3**

<u>PROPERTY TO BE SEARCHED</u>

SUBJECT VEHICLE 3: The white BMW registered to Amairani SANCHEZ at 9457 Plum Court, Hesperia, California, 92345, bearing California license plate 8UDE666, and any digital devices found therein.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute, possess with intent to distribute, and distribution of, controlled substances); 21 U.S.C. § 843(b) (use of a communication facility to facilitate a narcotics trafficking offense); and 18 U.S.C. §§ 1956 and 1957 (money laundering and engaging in financial transactions with the proceeds of specified unlawful activity) (the "Subject Offenses"), namely:

a.   Controlled substances and residue from those controlled substances, along with any manufacturing, cutting, and/or diluting agents used in manufacturing and/or distributing controlled substances;

b.   Drug paraphernalia, such as packaging, measuring, and weighing devices;

c.   Packaging and shipping materials and devices, including wrappers, heat sealers, plastics, tin foil, plastic wrappers, cellophane, jars, plastic bags, balloons and containers that can be used to package controlled substances or manufacture controlled substances;

d.   Containers, such as boxes, bags, briefcases, suitcases, that can be used to carry controlled substances or distribute controlled substances;

e.   Documents and records reflecting the identity of,

contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply for controlled substances, or drug customers, sources of funds, financial records, records that may indicate ownership of cash and funds, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs, and videos;

f.   Records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and times when controlled substances were bought, sold, or otherwise distributed;

g.   Contents of any calendar or date book, including calendars or date books stored on digital devices;

h.   Any materials, documents, or records that show the identity of the person(s) controlling, occupying, possessing, residing in, or owning the SUBJECT PREMISES, including rental agreements, leases, rent receipts, deeds, escrow documents, utility bills, insurance documents, registration documents, clothing, personal affects, and other mailed envelopes reflecting the address and addressee;

i.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

      j.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

         i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

         ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

         iii. evidence of the attachment of other devices;

         iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

         v.   evidence of the times the device was used;

         vi.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

         vii. records of or information about Internet Protocol addresses used by the device.

    2.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in

digital form on any digital device and any forensic copies
thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital devices on-site or
seize and transport the devices and/or forensic images thereof

to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital devices and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK"

(Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period,

obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

       h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

     5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

     6.   During the execution of this search warrant, law enforcement is permitted to: (1) depress RODRIGUEZ and LEON's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of RODRIGUEZ and LEON's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such

device.   In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Anthony G. Mitchell, being duly sworn, declare and state as
follows:

## I.  INTRODUCTION

1.    I am a Special Agent ("Agent") with the United States
Drug Enforcement Administration ("DEA"), Los Angeles Field
Division, and have been employed as such since February 2017.  I
am an investigative or law enforcement officer of the United
States within the meaning of Section 2510(7) of Title 18 of the
United States Code.  I am empowered to conduct investigations
and to make arrests for federal felony offenses.  Since my
appointment as an SA, I have trained in and have been assigned
to the investigation of federal drug offenses.  From September
2016 through February 2017, I received extensive instruction at
the DEA Academy in Quantico, Virginia, in the investigation of
violations of the Controlled Substances Act and criminal
conspiracies involving the smuggling and distribution of
narcotics and dangerous drugs.

2.    I am currently assigned to the Los Angeles Field
Division (LAFD), Enforcement Group 2.  During the course of my
employment with DEA, I have received several hundred hours of
comprehensive, formal instruction on such topics as drug
identification, money laundering techniques, patterns of drug
trafficking, complex conspiracies, the exploitation of narcotics
traffickers' telecommunications devices, criminal law,
surveillance, and other investigative techniques.  I have
initiated and assisted in investigations into the unlawful

importation, manufacture, possession with intent to distribute, and distribution of narcotics (including distribution by licensed medical professionals), marijuana, and other controlled substances, including methamphetamine, the laundering of narcotics proceeds, and conspiracies associated with narcotics and controlled substance offenses.  I have been involved in narcotics related arrests, conducted undercover operations, and executed search warrants, which resulted in the seizure of narcotics and other evidence, and supervised the activities of confidential informants who have provided information and assistance resulting in narcotic purchases.

3.   During the course of my employment with DEA, I have questioned suspects, debriefed informants, and have conferred with other law enforcement officers and prosecuting attorneys. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including, but not limited to, such techniques as surveillance, use of confidential sources, execution of search warrants, undercover operations, and telephone toll analysis.  I have participated in narcotics investigations for violations of 21 U.S.C. § 841(a)(1) as both a case agent and in a supportive role.  I have assisted in the arrests of multiple drug traffickers.  I have participated in several static and mobile surveillance activities across Southern California and have assisted in the execution of multiple search warrants.

## II. **PURPOSE OF AFFIDAVIT**

4.    This affidavit is made in support of a search warrant for the following vehicles believed to be used in drug dealing activities by Fidel Sanchez Rodriguez and Marlene Leon: the white Jeep registered to Marlene LEON at 9457 Plum Court, Hesperia, California, 92345, bearing California license plate 8AAH784 ("SUBJECT VEHICLE 1"); the dark gray Chevrolet Tahoe registered to Marlene LEON at 9457 Plum Court, Hesperia, California, 92345, bearing California license plate 8AJT371 ("Subject Vehicle 2"); and the white BMW registered to Amairani SANCHEZ at 9457 Plum Court, Hesperia, California, 92345, bearing California license plate 8UDE666 ("SUBJECT VEHICLE 3")(collectively the "SUBJECT VEHICLES"). The SUBJECT VEHICLES are further described in Attachments A-1 to A-3. The search warrant seeks to seize the items described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute, possess with intent to distribute, and distribution of, controlled substances); 21 U.S.C. § 843(b) (use of a communication facility to facilitate a narcotics trafficking offense); and 18 U.S.C. §§ 1956 and 1957 (money laundering and engaging in financial transactions with the proceeds of specified unlawful activity) (the "Subject Offenses"). The SUBJECT VEHICLES are routinely parked at 9457 Plum Court, Hesperia, California, 92345 (the "SUBJECT PREMISES.") Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

5.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.   Between November 17, 2021, and January 19, 2022, A DEA confidential source ("CS") conducted a series of controlled narcotics purchases with a group of narcotics traffickers consisting of Fidel Sanchez RODRIGUEZ ("RODRIGUEZ") and his suspected wife, Marlene Leon ("LEON") (jointly referred to as "Mama-Papa"), and their trafficking associate Jose Tomas HERNANDEZ ("HERNANDEZ").[1] The buys took place at a Target parking lot in Long Beach, CA, where HERNANDEZ and RODRIGUEZ drove together in a 2021 white Toyota Tacoma. In two of the controlled buys, DEA agents maintained surveillance on the white Tacoma as HERNANDEZ drove it to the SUBJECT PREMESIS and picked up RODRIGUEZ before proceeding to the Target. In each instance HERNANDEZ physically exchanged the drugs with the CS for money

---

[1] On April 4, 2023, a grand jury indicted RODRIGUEZ, HERNANDEZ and LEON for conspiracy to distribute controlled substances and distribution of controlled substances, and arrest warrants were issued for all three individuals.  These warrants have not yet been executed.

while RODRIGUEZ monitored the drug deals from a distance, remaining either in white Tacoma or at a nearby business.

7.    In December 2022, LEON provided the SUBJECT PREMISES as her home address to the San Bernadino County Sheriff's Department after her car was burglarized. On February 15, 2023, a package was mailed to LEON at the SUBJECT PREMISES.

8.    In April 2023, Agents conducting surveillance on the SUBJECT PREMISES observed the SUBJECT VEHICLES parked at the SUBJECT PREMISES. Additionally, they observed an unidentified individual conduct an apparent hand-to-hand drug transaction from SUBJECT VEHICLE 4, after which the individual returned SUBJECT VEHICLE 4 to the SUBJECT PREMISES.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my review of law enforcement reports, including CS debriefings, surveillance reports, and buy/walk reports, as well as conversations with other law enforcement agents, conversations with the CS, review of audio/video recordings, and my own knowledge of the investigation, I am aware of the following:

**A.    Background of Investigation and Identification of the SUBJECT PREMISES.**

10.    In June of 2019, DEA Agents arrested a Confidential Source[2] ("CS") and another individual pursuant to federal arrest

---

[2] The CS has been cooperating with the DEA since September 2019.  In 2019, the CS pled guilty to possession with intent to distribute a controlled substance, and conspiracy to distribute and possess with intent to distribute a controlled substance, in the United States District Court for the Central District of California.  The CS entered into a cooperation agreement.  The
*(footnote cont'd on next page)*

warrants after the CS shipped approximately two kilograms of cocaine from Los Angeles to Pennsylvania. During the CS's interview, the CS stated that a Hispanic male and his suspected wife, known collectively as "Mama-Papa," supplied the CS and the other individual with the cocaine.

11.  The CS arranged a meeting with Mama-Papa on September 11, 2021, at the Cerritos Mall to discuss further drug purchases. Mama-Papa arrived at the Cerritos Mall in a dark gray Chevrolet Tahoe bearing California license plate 8AJT371 (SUBJECT VEHICLE 2), which was registered to LEON at the SUBJECT PREMISES, and the CS later identified LEON as "Mama."

12.  DEA Agents searched for the SUBJECT PREMISES in law enforcement databases, and identified RODRIGUEZ as associated with the SUBJECT PREMISES. The CS subsequently identified RODRIGUEZ as "Papa" after viewing a mugshot for RODRIGUEZ from a 2020 arrest by the San Bernardino Sheriff's Department.  Agents also located pictures of LEON and RODRIGUEZ together on social media.  I subsequently determined based on an inquiry with Immigration and Customs Enforcement that RODRIGUEZ is a Mexican citizen residing in this country illegally.

---

CS has provided valuable actionable information regarding several narcotics traffickers operating in the greater Los Angeles area.  The information provided by the CS has been corroborated by law enforcement to the extent possible.  The CS has one prior assault in the third degree conviction from a New York state case, and was previously deported for being an illegal alien.

**B.    December 2, 2021: Controlled Purchase of Approximately 1,000 Counterfeit Blue 30 Milligram Oxycodone Pills Containing Compressed Fentanyl Arranged by RODRIGUEZ and LEON.**

13.  Between November 2021 and January 2022, the CS arranged for a number of controlled purchase of narcotics on behalf of law enforcement.  Specifically, in a series of recorded calls from around November 17, 2021, through December 1, 2021, RODRIGUEZ and LEON arranged to sell the CS 1,000 counterfeit blue 30 milligram Oxycodone pills containing compressed fentanyl on December 2, 2021, at a Target parking lot located in Long Beach, CA (the "Target Parking Lot"). The CS explained that because RODRIGUEZ speaks limited English, LEON typically translates for RODRIGUEZ when setting up narcotics transactions over the phone.

14.  On December 2, 2021, in advance of the controlled purchase of narcotics from RODRIGUEZ and LEON, members of the Torrance Police Department established surveillance at SUBJECT PREMISES.

15.  At approximately 10:01 a.m., the CS placed a recorded call to RODRIGUEZ and LEON, and LEON stated that RODRIGUEZ was on his way to meet the CS. A short time later, Torrance PD Det. Masone saw a White Toyota Tacoma bearing California license plate 12847H3 and registered to "Jose HERNANDEZ" at 16216 Vine St., Hesperia, California 92345 (the "White Tacoma") arrive at the SUBJECT PREMISES and park on the curb. He then saw RODRIGUEZ's trafficking associate Jose Tomas HERNANDEZ[3] exit the

_____

[3] Hernandez's identity was confirmed using his DMV photo based on the registration of the White Tacoma.

vehicle and enter the SUBJECT PREMISES. A short time later, HERNANDEZ and RODRIGUEZ exited the SUBJECT PREMISES, got in the White Tacoma, and drove toward the Target Parking Lot.

16.  In advance of the controlled purchase, DEA agents searched the CS and his/her vehicle for currency and contraband with negative results.  The CS was then given devices to covertly audio and video record the planned controlled purchase, as well as $3,000 in official advanced funds.

17.  At approximately 11:17 a.m., HERNANDEZ told the CS on a recorded line that HERNANDEZ was close to the Long Beach Target Parking Lot, and DEA agents and TORRANCE PD established surveillance in the vicinity of the same.

18.  At approximately 11:36 a.m., Det. Masone saw the White Tacoma enter the Food 4 Less parking lot adjacent to the Target Parking Lot. Agent Drobac also saw pings of RODRIGUEZ's telephone which indicated it was in the vicinity of the Target Parking Lot.[4] Upon arrival, RODRIGUEZ and HERNANDEZ exited the White Tacoma and entered the Target Department store. At approximately 11:56 a.m., Det. Masone installed a GPS tracker[5]

---

[4] On December 1, 2021, the government received authorization to obtain Global Positioning System (GPS) precision location information and cell-site simulator information for RODRIGUEZ's cell phone, target telephone number 323-994-3278. The initial authorization was for 45 days, and a second such authorization for 45 days was granted for the same number on January 13, 2022.

[5] The government received authorization for GPS precision location information for the White Tacoma on November 29, 2021(21-MJ-5421). The government was granted 2 extensions for GPS precision location information for the White Tacoma on January 11, 2022, and February 23, 2022.

on the White Tacoma while it was parked in the Food 4 Less parking lot.

19.  At approximately 12:16 p.m., Agent Ellis Beamon saw HERNANDEZ wearing a black sweatshirt, black pants, black hat and a mask walking towards the driver-side door of the CS's vehicle. At the driver-side window, HERNANDEZ dropped an object into the CS's vehicle.  A short time later, Det. Masone saw the CS hand HERNANDEZ $2,500 of the $3,000 allocated as official advanced funds, and saw HERNANDEZ count the money. HERNANDEZ then walked away from the CS's vehicle and out of sight.  A short time later, HERNANDEZ and RODRIGUEZ got back in the White Tacoma and drove out of the lot.

20.  Agents Conway and Drobac met with the CS at a predetermined safe location.  The CS gave the agents one white and dark brown clear container with a white and purple label reading "New Chapter Perfect Prenatal Whole-Food Multivitamin" containing approximately 1,000 blue circular pills.  The CS also returned $500 of the original $3,000 official advanced funds to Agent Conway.  Agents Sinclair and Drobac searched the CS and their vehicle for contraband other than the narcotics purchased, and weapons, and found none.

21.  A DEA laboratory analysis subsequently confirmed the purchase to be pills containing Fentanyl.

22.  Based on my training and experience, I know that narcotics traffickers often arrive at planned narcotics transactions without physically handling the narcotics that they plan to sell or deliver. They will have a courier and will

either drive a secondary vehicle or ride as passenger with the courier to mitigate their risk of being caught with narcotics in their possession. This also allows them to examine the meet location and determine if law enforcement personnel are present before a transaction. With this in mind, I believe that on December 2, 2021, RODRIGUEZ was using HERNANDEZ as a narcotics courier and the White Tacoma to transport the narcotics to the CS. Further, while HERNANDEZ and the CS were meeting, the White Tacoma was positioned in a way that allowed RODRIGUEZ to watch the meeting and the surrounding area, which is consistent with being a look-out for a narcotics transaction.

   **C.   January 19, 2022: Controlled purchase of 2 pounds of methamphetamine arranged by RODRIGUEZ and LEON.**

   23.   In a series of recorded calls between January 4 and January 19, 2022, RODRIGUEZ and LEON arranged to sell the CS two pounds of methamphetamine for $2,400 on January 19 at the Target Parking Lot.

   24.   On January 19, 2022, Agents Ellis Beamon and Erwin Benedicto established surveillance in the vicinity of Hernandez's residence in the rear unit of a two-structure compound at 20637 Dominguez Road, Apple Valley, California 92308 (the "Hernandez Residence"). Upon arrival at the Hernandez Residence, Agent Beamon saw the White Tacoma parked in the driveway. A short time later, I established surveillance in the vicinity of the SUBJECT PREMISES.

   25.   At approximately 10:44 a.m., aerial surveillance recorded a blue hatchback pulling into the driveway and parking

at the Hernandez Residence. An unknown female (UF-1) wearing a white long sleeve shirt and dark pants exited the vehicle, walked around the rear of the vehicle to the front passenger door, opened it and leaned inside. While UF-1 leaned into the vehicle, an unknown female (UF-2) wearing a pink and white shirt left the front residence and walked toward UF-1. UF-1 retrieved two white grocery bags from the vehicle and handed them to UF-2. Both UF-1 and UF-2 walked to the rear residence and entered the door on the east side.

26.   A short time later, HERNANDEZ emerged from the rear residence carrying a plain white grocery bag like the two just described, and got in the driver seat of the White Tacoma. HERNANDEZ then drove to the SUBJECT PREMISES and parked in front of the driveway on the street. RODRIGUEZ walked out of the SUBJECT PREMISES and got into the front passenger seat of the White Tacoma, and HERNANDEZ drove the White Tacoma to the Target Parking Lot.

27.   DEA agents met the CS in a safe and neutral location in Long Beach, CA in preparation for a controlled purchase operation. Agents Sinclair, Conway, Suntrup and Drobac searched the CS and the CS' vehicle for the presence of contraband and weapons with negative results. The CS was provided $2,500.00 of DEA operational funds for the purchase. Torrance PD and DEA agents established surveillance in the vicinity of the Target Parking Lot.

28.  At approximately 12:25 p.m., HERNANDEZ asked the CS on a recorded call what time the CS would be at Target and the CS stated they would be there in 20 minutes.

29.  At approximately 12:36 p.m., Agent Beamon saw the White Tacoma enter the Food 4 Less parking lot, located at 6700 Cherry Ave., Long Beach, CA. As noted previously, Food 4 Less and Target are adjacent to one another. A short time later, the CS explained to HERNANDEZ on a recorded call where the CS parked in the Target Parking Lot.

30.  At approximately 12:44 p.m., Agent Drobac saw HERNANDEZ pushing a Target shopping cart containing a white grocery bag through the parking lot towards the CS' vehicle. The white grocery bag matched the description of the plain white grocery bag aerial surveillance had seen HERNANDEZ leave the HERNANDEZ Residence with. HERNANDEZ, wearing a black shirt, black pants and a blue mask, walked to the front drivers-side window of the CS' vehicle and handed the white grocery bag through the window. The CS then handed HERNANDEZ the operational funds. The CS and HERNANDEZ engaged in a conversation in which HERNANDEZ stated the price for a kilogram of cocaine was 22 or 23, referring to $22,000 or $23,000. HERNANDEZ then walked away from the CS' vehicle in the direction of Target. A short time later, Agent Benedicto saw RODRIGUEZ and HERNANDEZ walking from Target to the White Tacoma parked in the Food 4 Less parking lot. RODRIGUEZ and HERNANDEZ entered the White Tacoma and drove away.

31.   Agents Conway and Drobac met with the CS at the predetermined safe and neutral location and received one white grocery bag containing a cardboard box with Christmas trees printed on it. Within the cardboard box was a clear plastic storage container with a pink lid containing a white crystalline substance, which was later confirmed by a DEA lab to be approximately 847 grams of methamphetamine.

32.   Based on my training and experience, I believe that UF-1 transported the narcotics in the blue hatchback to the HERNANDEZ Residence, and that the narcotics were inside the two white grocery bags UF-1 retrieved from the blue hatchback. Once the narcotics arrived, HERNANDEZ transported the white grocery bag in the White Tacoma to the SUBJECT PREMISES and then to Target where HERNANDEZ handed the CS approximately two pounds of methamphetamine in the same bag. Finally, I believe RODRIGUEZ directed UF-1 to drop off the narcotics with HERNANDEZ to mitigate his direct involvement with them.  With this in mind, RODRIGUEZ was again utilizing HERNANDEZ as a narcotics courier to transport the narcotics to the CS in the White Tacoma. Additionally, while HERNANDEZ and the CS were meeting, RODRIGUEZ and the White Tacoma were positioned in a way that allowed RODRIGUEZ to watch the meeting and the surrounding area, which is consistent with being a look-out for a narcotics transaction.

**D.   March 14, 2022: LEON Calls the CS Asking Why They Have Not Ordered Narcotics.**

33.   On March 14, 2022, LEON called the CS, on a recorded call, and asked why the CS had suddenly stopped calling. She

then accused the CS of buying narcotics from HERNANDEZ instead from her and RODRIGUEZ.

34.  Based on my training and experience, I believe that since the CS had not purchased narcotics from LEON and RODRIGUEZ in over a month, LEON had grown suspicious of the CS and believed that the CS was purchasing methamphetamine from HERNANDEZ directly.

**E.    June 1, 2022: Surveillance of RODRIGUEZ and LEON following an aborted controlled buy results in seizure of approximately 4 kilograms of cocaine.**

35.  In a series of recorded calls from around May 2022 through June 1, 2022, RODRIGUEZ and LEON agreed to sell the CS approximately 1,000 counterfeit blue 30 milligram Oxycodone pills containing fentanyl for $2,000, and agreed to meet between 10:00 and 10:30 a.m. on June 1, 2022, at a Target Parking Lot in Long Beach, California.

36.  On June 1, 2022, DEA agents established surveillance in the vicinity of the SUBJECT PREMISES prior to the scheduled controlled buy between RODRIGUEZ and the CS.

37.  The CS placed a recorded call to RODRIGUEZ to confirm the drug deal, and RODRIGUEZ told the CS he would call them back. The CS placed multiple recorded calls to RODRIGUEZ throughout the day, but RODRIGUEZ never answered or called back.

38.  Instead, at approximately 9:30 am, Agents surveilling the SUBJECT PREMISES saw LEON and RODRIGUEZ depart in a Black Kia bearing California license plate 7PXY392 and registered to LEON (the "Black Kia") and drive to a residence at 8613 Cedar Street, Bellflower, CA, 90706, (the "Cedar St. Residence").

Agents tracked GPS pings[6] on RODRIGUEZ's phone as he travelled to the Cedar St. Residence, and Torrance Police Officers then observed him standing in the garage at approximately 12:30 p.m.

39.    Shortly thereafter, a gray Tesla arrived at the Cedar St. Residence, was waved into the garage by RODRIGUEZ, and departed approximately three hours later.  Working in conjunction with the DEA, the Los Angeles Sheriff's Department conducted a traffic stop on the gray Tesla which resulted in the seizure of approximately four kilograms of suspected cocaine from the trunk.  Based on my training, experience, and knowledge of this investigation, I believe that RODRIGUEZ and LEON were continuing to engage in narcotics trafficking as recently as June 2022.

**F.    April 4, 2023: HERNANDEZ, RODRIGUEZ and LEON Federally Indicted on Drug Distribution Charges in the Central District of California.**

40.    On April 4, 2023, RODRIGUEZ, HERNANDEZ and LEON were federally indicted for conspiracy to distribute controlled substances and distribution of controlled substances, in violation of Title 21, United States Code, Sections 846, 841(a)(1),(b)(1)(A)(viii),(b)(1)(B)(vi). On that same date, federal arrest warrants for RODRIGUEZ, HERNANDEZ and LEON were issued. These warrants have not yet been executed.

---

[6] On May 9, 2022, the government was authorized to obtain Global Positioning System (GPS) precision location information and cell-site simulator information for target telephone number 820-234-7914. The authorization for the collection of GPS and cell-site simulator information was granted for a period of 45 days from the issuance of the court order.

**G.   December 11, 2022-February 15, 2023: LEON Provides the
SUBJECT PREMISES as Her Home Address to the San
Bernardino Sheriff's Department and Receives Mail
There.**

41.  On April 14, 2023, Agent Drobac used a law enforcement
database to determine whether LEON and RODRIGUEZ still resided
at the SUBJECT PREMISES.  He determined that, on December 11,
2022, LEON filed a police report after her car was burglarized
in which she listed the SUBJECT PREMISES as her home address.
Additionally, based on a report from U.S. Postal Inspector
Joseph Weidenkopf, LEON received a package addressed to her at
the SUBJECT PREMISES recently as February 15, 2023.

**H.   April 11, 2023, Surveillance of the SUBJECT PREMISES
Confirms Cars Registered to LEON in the Driveway.**

42.  On April 11, 2023, Agents Sinclair and Drobac
conducted surveillance in the vicinity of the SUBJECT PREMISES.
Agent Drobac observed a SUBJECT VEHICLE 1, and SUBJECT VEHICLE 2
parked in the driveway of the SUBJECT PREMISES. Agent Drobac
later determined that both cars are registered to LEON at the
SUBJECT PREMISES.  The agents also observed SUBJECT VEHICLE 3
parked in the driveway at the SUBJECT PREMISES.  SUBJECT VEHICLE
3 is registered to Amairani SANCHEZ at the SUBJECT PREMISES. I
later determined that SANCHEZ is a relative of RODRIGUEZ based
on my review of various social media posts showing the SANCHEZ
and RODRIGUEZ together when SANCHEZ was a young girl.

**I.   April 17, 2023: Surveillance of the SUBJECT PREMISES Captures an Apparent Drug Transaction.**

43.   At approximately 4:27 p.m. on Monday, April 17, 2023, Agent Benedicto and myself established surveillance at the SUBJECT PREMISES.

44.   At 4:37 p.m., I saw the White BMW (SUBJECT VEHICLE 3) arrive and park in the driveway of the SUBJECT PREMISES. I then saw a woman appearing to match LEON's height, build, and physical appearance exit the driver's seat and enter the SUBJECT PREMISES.

45.   At 6:12 p.m., Agent Benedicto saw SUBJECT VEHICLE 3 leave the SUBJECT PREMISES, this time driven by an unknown person. I then watched it travel to a McDonald's located at 14466 Main Street Pad G, Hesperia, California 92345, where it backed into several parking spots several times in close proximity.

46.   At 6:18 p.m. a light gray 2015 Volkswagen Jetta parked next to the SUBJECT VEHICLE 3 (driver door to driver door). The driver's door windows on both vehicles immediately lowered and the driver of the SUBJECT VEHICLE 3 handed the driver of the Jetta an orange and white cardboard box (approximately the size of a shoe box) through the windows. The Jetta immediately drove west through the parking lot and out of view. SUBJECT VEHICLE 3 then left the parking lot and returned to the SUBJECT PREMISES, after which the driver entered the SUBJECT PREMISES.

47.   Based on my training and experience, the unusual behavior of the SUBJECT VEHICLE 3 in the McDonalds parking lot,

and the similarity of this interaction to the controlled buys
orchestrated through the CS, I believe that the box passed
through the window and into the Jetta contained narcotics. I
further believe, based on the similarity of this transaction to
the others described above, in which a vehicle stopped at the
SUBJECT PREMISES before proceeding to conduct a drug
transaction, that this transaction took place under the
supervision of RODRIGUEZ and LEON, and that they continue to use
the SUBJECT PREMISES in narcotics trafficking.

48.   Based on the above, in conjunction with the December
11, 2022, police incident report filed by LEON listing her
residence as the SUBJECT PREMISES, the fact that LEON continues
to receive mail at the SUBJECT PREMISES, and the April 11, 2023
surveillance indicating multiple vehicles registered to LEON at
the SUBJECT PREMISES, I believe LEON and RODRIGUEZ are still
living at the SUBJECT PREMISES. Based on my training and
experience, I believe that the absence of similar documentary
ties connecting RODRIGUEZ to the SUBJECT PREMISES is due to the
fact the fact that he lacks legal status in this country and is
therefore less likely to register vehicles or otherwise conduct
business in his own name. I have not seen any indication that
RODRIGUEZ and LEON have filed for divorce, or anything else that
would suggest he no longer resides there.

**V. TRAINING AND EXPERIENCE ON DRUG OFFENSES**

49.   Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

50.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

51.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, stash houses, and vehicles.

52.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

53.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses, and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, stash houses, and vehicles, including in the form of calendar entries and location data.

54.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

55.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, stash houses, and vehicles.

56.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, stash houses, and vehicles, or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

57.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and

suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON THE USE OF VEHICLES IN DRUG TRAFFICKING

58.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, and in addition to the practices related to storing narcotics and associated items in vehicles already described in the section above, I know the following:

59.  Drug traffickers often register the vehicles they use as part of their trafficking operation under the names of other people, including family and friends, in order to conceal the fact that they are the primary operator of the vehicle.

60.  Drug traffickers also take steps to conceal drugs or other contraband within the vehicle, either by storing it in unusual places in the vehicle (such as within a spare tire) or by modifying the vehicles themselves to add hidden compartments.

61.  It is also not uncommon for drug traffickers to hide the vehicles themselves, including by parking them off-site from their ordinary residence and in concealed or hidden locations.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

62.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

63.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

64.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

65.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

66.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

67.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

68.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RODRIGUEZ and LEON's thumb and/or fingers on the devices; and (2) hold the devices in front of RODRIGUEZ and LEON's faces with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### VIII. REQUEST FOR NIGHTTIME SERVICE

69.   I request that the Court authorize investigators to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii). Good cause for nighttime service exists as follows:

70.   In my training and experience and based on my conversations with other experienced law enforcement officers, individuals who traffic drugs take many efforts to protect their illicit products, which include protecting against potential

25

burglary and robbery by competing drug dealers and other
criminal elements or defending against search warrants or raids
by law enforcement officers. In doing so, drug traffickers
create a high-risk situation in which both criminal elements and
law enforcement can be the target of violence upon approach and
entry into residences to effectuate valid search warrants. A
means of mitigating that potential threat in this case would be
the granting of nighttime service. Nighttime service will give
law enforcement the ability to get within close proximity of the
SUBJECT LOCATION if LEON and RODRIGUEZ are at home and likely
asleep. The ability to serve the requested warrants at night
will provide law enforcement with a better opportunity to enter
the SUBJECT LOCATION without incident to ensure everyone's
safety.

All of the above factors apply in this instance. RODRIGUEZ and
LEON are known to engage in countersurveillance to avoid
detection by law enforcement, and Agents have observed multiple
external cameras at the SUBJECT PREMISES. RODRIGUEZ has also
previously been arrested with a controlled substance while in
possession of an unlicensed firearm, and I believe he likely has
other weapons at the SUBJECT PREMISES. Further, nighttime hours
are the time we are most likely to find RODRIGUEZ and LEON at
home, as investigation has shown that they often travel long
distances during the day to engage in drug transactions, leaving
in the morning and returning in the evening. By contrast, Court
authorized GPS location data has shown RODRIGUEZ spending long
periods of time at the SUBJECT LOCATION during the nighttime

hours. Given these facts, I believe that nighttime service is warranted in this case.

## IX. CONCLUSION

71.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT VEHICLES, as described in Attachments A-1, A-2, and A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 25th day of
April, 2023.


_____
HON. ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE